**SIGNED this 23rd day of April, 2007.**

_____

**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

### Western District of Texas
### San Antonio Division

| | |
|---|---|
| IN RE | BANKR. CASE NO. 01-54158 |
| DANIEL WAYNE MAHONEY. | |
| *DEBTOR* | CHAPTER 7 |
| DANIEL WAYNE MAHONEY | |
| *PLAINTIFF* | |
| V. | ADV. NO. 06-5187-LMC |
| WASHINGTON MUTUAL, INC. AKA WASHINGTON MUTUAL CARD SERVICES FKA PROVIDIAN FINANCIAL CORPORATION | |
| *DEFENDANT* | |

### DECISION GRANTING MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant Washington Mutual's motion for summary judgment [Doc. # 16] ("Motion"), Plaintiff's reply thereto [Doc # 26] ("Reply"), and Defendant's response [Doc. # 28]. The question before the Court is whether the bare fact that the post-bankruptcy debtor's credit reports contain information showing that a debt is still owed to a creditor – with nothing more

– sufficiently makes out a claim of violation of the discharge injunction. Because the Court believes that it does not, the Defendant's Motion for Summary Judgment is GRANTED.

## Background

Plaintiff Daniel Wayne Mahoney filed a chapter 7 bankruptcy petition on September 1, 2001 and received his discharge on October 5, 2002. The case was closed on November 7, 2002. On September 6, 2006, this Court reopened the case to enable Mahoney to file a complaint seeking damages for an alleged violation of the discharge injunction by Washington Mutual.

Mahoney filed the original complaint in this case on September 18, 2006 [Doc. #1]. In his complaint, Mahoney alleges two causes of action arising from the Defendant's reporting of Plaintiff's pre-petition debts to credit reporting agencies. First, Plaintiff alleges that reports that the Defendant filed with credit reporting agencies concerning the Plaintiff's pre-petition debts constituted a violation of section 524 of the Bankruptcy Code, in that the reports were an act by the Defendant to collect a debt that had been discharged. *See* 11 U.S.C. § 524. Second, Plaintiff alleges that the same act constitutes the "independent tort of unreasonable collection efforts."

## Jurisdiction

A pleading setting forth a claim for relief must contain a short and plain statement of the grounds upon which the court may exercise jurisdiction. FED. R. CIV. P. 8(a). In his complaint, Plaintiff states that the Court has jurisdiction because the matters presented are core proceedings, impliedly invoking this Court's jurisdiction under sections 157 and 1334 of Title 28. *See* 28 U.S.C. §§ 157, 1334(b). Plaintiff states two grounds for relief, for which the Court will determine its jurisdiction separately.

As his first cause of action, Plaintiff claims that the Defendant committed an act violating

the discharge injunction. *See* 11 U.S.C. § 524. The Court has the inherent power to enforce its own injunctions. *See In re Gervin*, 337 B.R. 854, 857 (Bankr. W.D. Tex. 2005). Jurisdiction over the alleged violation of the discharge injunction is therefore proper.

As his second cause of action, plaintiff claims that Defendant committed "the independent tort of unreasonable collection efforts" citing *Southwestern Bell Telephone Co. v. Wilson*, 768 S.W.2d 755, 757 (Tex. App.–Corpus Christi 1988, writ denied). Plaintiff, without authority, contends that adjudication of this "independent tort" constitutes a "core proceeding." *See* 11 U.S.C. § 157.

Section 157 of the Bankruptcy Code provides a non-exhaustive list of core proceedings. 28 U.S.C. § 157(b)(2). The tort alleged in this case does not fit in any of these categories. However, this does not conclude the inquiry. The Fifth Circuit has held, "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Matter of Wood*, 825 F.2d 90, 97 (5th. Cir. 1987). The tort of unreasonable collection efforts is not "a substantive right provided by title 11"; it is a creature of Texas common law. *See generally Harned v. E-Z Fin. Co.*, 254 S.W.2d 81 (Tex. 1953); *Duty v. Gen. Fin. Co.*, 273 S.W.2d 64 (Tex. 1954). Regarding the second *Wood* prong, the tort of "unreasonable collection efforts" is not "a proceeding that, by its nature, could arise only in the context of a bankruptcy case"; such claims arise without the filing of a bankruptcy petition. *See e.g. id.* In all events, this particular tort could not be said to have arisen in the case because it arose after the case was closed. Thus, this is not a core proceeding.

The matter might still fall within the bankruptcy subject matter jurisdiction of the federal courts if the tort could be said to be "related to" the bankruptcy case (though it would then be a non-

core proceeding, with different procedural consequences). *See* 28 U.S.C. §§ 1334(b), 157(a). The facts giving rise to Plaintiff's claims deal with events occurring well after the bankruptcy case was concluded. The mere fact that Plaintiff was a Debtor in a bankruptcy case is not of itself sufficient to confer "related to" jurisdiction. "For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). In this case, the tort claim, if proven, would have no effect upon the administration of the bankruptcy case, which was concluded long prior to the events from which the tort is said to have arisen. Therefore, "related to" jurisdiction does not attach.

Plaintiff bases the "unreasonableness" prong of the tort claim upon common facts with the claim for violation of the discharge injunction. However, common facts are not sufficient to confer "related to" jurisdiction. *In re Canion*, 196 F.3d 579, 585 (5th Cir. 1999). Because this tort is not one arising under the Code, or arising in or related to the case, the court lacks subject matter jurisdiction over its adjudication, and so dismisses the claim for want of jurisdiction. *See* 28 U.S.C. § 1334(b); Fed. R. Civ. P. 12(b)(1).

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is proper when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When as here, a defendant moves for summary judgment by alleging an absence of evidence on a required element of any claim brought by the plaintiff, the burden shifts to the non-movant/plaintiff to "make a showing sufficient to establish the evidence of [the] element essential to that party's case, and on which that party will bear the burden

of proof at trial." *Celotex Corp. v. Catrett,* 106 S.Ct. 2548, 2552 (1986). When the non-movant/plaintiff cannot establish a genuine issue of material fact regarding a required element of its claim, then summary judgment is proper for the defendant because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* "Conclusory allegations unsupported by specific facts . . . will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any significant probative evidence tending to support the complaint'." *Nat'l Ass'n of Gov. Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 713 (5th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) (modifications in original).

## Discussion

In a chapter 7 case, at the time fixed for filing a complaint objecting to discharge, a bankruptcy court will grant a discharge to a debtor. FED. R. BANKR. P. 4004(c); *see* 11 U.S.C. §§ 524(a), 727(a). The discharge acts as a permanent injunction, barring any person from acting to collect, recover or offset the debtors discharged debts. 11 U.S.C. § 524(a). Plaintiff alleges that Defendant violated this statutory injunction.

At the center of the disposition of this case lies a simple question: what constitutes an "act" to collect a discharged debt in violation of the discharge injunction? Though many courts have confronted the issue, few clear rules emerge. *See In re Vogt*, 257 B.R. 65, 70 (Bankr. D. Colo. 2000) (collecting cases). The *Vogt* court, reviewing several cases, concluded that "It is largely a matter of the court knowing it when it smells it." *Id.* While a general answer may elude a clear formulation, several courts, including *Vogt*, have considered the question as applied to the narrower range of facts involving the credit reporting process, especially in the context of allegations that a creditor

manipulated that process in ways that are said to violate the discharge injunction. After reviewing factually-similar published decisions on the issue, this Court concludes that the mere reporting of credit information about a debtor *vel non* is not an "act" to collect a discharged debt within the meaning of the statute, unless the evidence shows (or in the context of a summary judgment motion, *might* show) that there is a linkage between the act of reporting and the collection or recovery of the discharged debt. On Defendant's summary judgment motion, Plaintiff bears the burden of producing summary judgment evidence sufficient to raise an issue of material fact that connects Defendant's credit reporting with collection activity.

The Court begins its review of the case law with *Vogt*. Procedurally, *Vogt* was decided on an application for default judgment. *Id.* at 67. That is, if the facts alleged by the plaintiffs (the Vogts) had properly supported a cause of action under section 524, a default judgment would have been properly granted to the Plaintiffs. *See* FED. R. CIV. P. 55. The Vogts, at the time they filed their bankruptcy petition, owed a debt to a leasing company. *Id.* at 69. The leasing company assigned the debt to a third party. The debt was discharged in bankruptcy. *Id.* About five years later, the Vogts were informed that, because the leasing company debt was still shown as "due and owing" on their credit report, their application for a home loan was in jeopardy. *Id.* The Vogts, apparently believing that the bankruptcy had *extinguished* the debt, contacted the third party, who agreed to "correct" the credit report if the debt was paid. However, even after the Vogts made the requested payment, the creditor did not "correct" the credit report, and the Vogts had to pay higher closing costs and interest rates on their home loan. *Id.*

The *Vogt* court first noted that the plaintiffs were simply wrong when they alleged that because of the bankruptcy, plaintiffs did not owe a debt. *Id.* at 70 ("It is apparent from the complaint

in this case that the Plaintiffs believe that the effect of the order of discharge is to wipe away the debt. But that is clearly not the case."). Bankruptcy does not erase debt; the discharge is only an injunction against attempts to collect the debt as a personal liability of the debtor. *See* 11 U.S.C. § 524(a); *Vogt*, 257 B.R. at 70. Therefore, said the court, there was nothing inherently wrong with the *Vogt* creditor continuing to maintain that the debt was still due and owing – because, in truth, it was. *Id.* The creditor could maintain that position, and even report that information to a credit reporting agency and not be guilty of representing anything inconsistent with the letter of the Bankruptcy Code. *Id.*

The *Vogt* court, despite the fact that the defendant never appeared, refused to grant the default judgment to plaintiffs. Regarding the creditor's position concerning the removal of the information on the debt from the Vogts' credit report, the court found it significant that it was not the creditor who contacted the Vogts, but rather the Vogts that contacted the creditor. It wrote:

> The creditor was under no obligation under the Bankruptcy Code to change the way it reported the status of the loan. False reporting, if not done to extract payment of the debt, is simply not an act proscribed by the Code. There is absolutely no showing in this case that the Defendant had manufactured a false report in order to extract payment. to the contrary . . . Defendant had apparently never made an effort to contact the Plaintiffs or to otherwise seek to collect the discharged debt.

*Id.* The case was therefore dismissed. *Id.* at 72.[1]

A later case, also in the posture of an application for default judgment, relied upon *Vogt* to reach a similar conclusion. *In re Irby*, 337 B.R. 293 (Bankr. N.D. Ohio 2005). *Irby* confronted the question whether a violation of the discharge injunction was made out by a showing that two

---

[1] The *Vogt* court may have been mistaken in failing to recognize that the creditor's *conditioning* its willingness to *change* its report on payment of the debt might be said to have violated the discharge. *See Vogt*, 257 B.R. at 69. Once the creditor knew why the debtor needed a change, and reacted opportunistically, *that act* could conceivably constitute a violation of the discharge. In this regard, then, *Vogt* probably ought not be treated as good law.

creditors continued to report that there was a balance owed on a discharged debt. *Id.* at 294-95. The

plaintiffs in *Irby* alleged that because the creditors continued to report a balance due, the plaintiffs

were forced to pay a higher rate on a home mortgage. *Id.* Plaintiffs complained that the credit report

falsely showed a debt as still owing when it should not have, because that debt was discharged in the

bankruptcy. *Id.*

The *Irby* court disagreed, dismissing the case. *Id.* at 297. It began by noting – again – that the

bankruptcy discharge does not erase debt:

> [I]t is evident that the Plaintiffs' have based the success of their cause of action on a
> common misconception of bankruptcy law: that the bankruptcy discharge eliminates
> the very existence of a debt. But this is not the case. Nowhere in the Bankruptcy
> Code does it provide that a debt is extinguished. Instead, § 524, entitled "Effect of
> Discharge," limits its breadth to "operat[ing] as an injunction against the
> commencement or continuation of an action" to collect or recover a debt. The statute
> then goes on to limit the applicability of this "injunction" with this important proviso:
> "as a personal liability of the debtor [.]" In this way, upon discharge, it is only a
> debtor's personal obligation to pay the debt that is effectively extinguished; the debt
> itself remains.

*Id.* at 295. With extensive support from *Vogt*, the *Irby* court concluded that "it is difficult to discern

how – and therefore, the Court cannot conclude that – the sole act of reporting a debt, whose

existence was never extinguished by the bankruptcy discharge, violates the discharge injunction."

*Id.*

Defendant, relying upon *Vogt* and *Irby*, argues that because all it has done is report credit

information, Plaintiff has not stated a cause of action for violation of the discharge. Naturally,

Plaintiff disagrees. Plaintiff implies that making a credit report *is itself* an act to collect a debt. He

writes "Placing of a notation in a debtor's credit report was considered *along with other collection

activities* to find violations of the discharge injunction in *In re Goodfellow*, 298 B.R. 358, 362

(Bkrtcy.N.D.Iowa 2003), and *Miele v. Sid Bailey, Inc.*, 192 B.R. 611, 613 (S.D.N.Y.1996)." Plaintiff's Reply ¶ 4 (emphasis added). True, but this undercuts Plaintiff's argument, rather than supporting it. In the cases cited, there were *other collection activities*, the types of affirmative, post-petition acts that might support finding a violation of the discharge injunction.

Plaintiff also cites *In re Sommersdorf*, 139 B.R. 700 (Bankr. S.D. Ohio 1991) for the proposition that "the placing of a notation on a debtor's credit report 'must certainly be done in an effort to effect collection of the account'"[2]. Plaintiff's Reply at ¶ 4. This Court respectfully disagrees with *Summersdorf*, however, because it makes this conclusion without real support. We reproduce the relevant paragraph below.

> At the hearing, counsel for [the creditor-bank] stated that federal banking audit requirements require a bank to charge off any amount which is more than four months in arrears and that it was [creditor's] practice to do such. However, there is a distinction between an internal bank accounting procedure and the placing of a notation on an obligor's credit report. We find that the latter most certainly must be done in an effort to effect collection of the account. *See In re Spaulding*, 116 B.R. 567, 570 (Bankr.S.D.Ohio 1990) (while it may be an increased burden for creditors to take extra steps to prevent violations of the automatic stay, creditors who fail to do so proceed at their own peril). Such a notation on a credit report is, in fact, just the type of creditor shenanigans intended to be prohibited by the automatic stay. H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 342 (1977) reprinted in 1978 U.S.Cong. & Admin.News 5787, 6298 ("Paragraph (6) prevents creditors from attempting in any way to collect a prepetition debt. Creditors in consumer cases occasionally telephone debtors to encourage payment in spite of bankruptcy. Inexperienced, frightened or ill-counseled debtors may succumb ...").

*Matter of Sommersdorf*, 139 B.R. 700, 701 (Bankr. S.D. Ohio 1991). There are three notable problems here. First, the citation to *In re Spaulding* says nothing – zero – about the intent of an actor who reports credit information. Second, the citation to the congressional record says nothing –

---

[2] Plaintiff misquotes the case, which actually reads, "most certainly must be done in an effort to effect collection of the account." *Sommersdorf*, 139 B.R. at 701. The meaning, of course, is the same.

nothing at all – about credit reporting. The rhetoric in *Sommersdorf* writes checks that the authorities cannot cash. While it may have been true in *Summersdorf* – as a factual matter – that the creditor intended to spur collection of the debt when affirmatively placing an entry in the co-obligor's credit report, it is too great a leap to say, as a matter of *law*, that the mere reporting of a debt to a credit agency is a *per se* violation of the discharge injunction.[3]

The third (and most serious) problem is that *Summersdorf* implicitly, and incorrectly, assumes that the subjective intent of a creditor to violate the discharge injunction is material. Indeed, Plaintiff argues that the intent of a creditor making a credit report is a material fact, and that summary judgment is therefore precluded, citing *In re Singley*, 233 B.R. 170, 174 (Bankr. S.D. Ga. 1999)[4]. In fact, what is relevant is *not* the intent to violate the discharge, but rather the intent to commit *the act* that violates the discharge injunction. *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996) (finding that a defendant is in contempt if he knew of the discharge and intended the action violating the discharge). That is a distinction with a real difference. A plaintiff

---

[3] Treating the mere act of credit reporting, without more, as an act to collect on a debt would also fly in the face of section 1651c(a)(1) of title 15. Section 1651c mandates the exclusion of certain items from consumer credit reports. It reads, in relevant part:

> Except as authorized under subsection (b) of this section, no consumer reporting agency may make any consumer report containing any of the following items of information:
> (1) Cases under Title 11 or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years.

15 U.S.C. § 1681c. In other words, Congress expressly contemplates the reporting of a bankruptcy case by credit bureaus for up to 10 years after the bankruptcy filing date. *See id.*; 11 U.S.C. § 301(b) (filing of a voluntary bankruptcy case constitutes an order for relief). It cannot be the case that Congress both allows ten years of reporting that an individual has had a case under title 11, while at the same time barring a creditor from simply reporting such information to a consumer reporting agency in the first place.

[4] *Singley*, cited by the Plaintiff, does not involve the discharge injunction; rather, it involves the similar problem of whether credit reporting violates the automatic stay of section 362 or the co-debtor stay of section 1301. *Singley* states that credit reporting, "if made with the intent to harass or coerce a debtor and/or co-debtor into paying a pre-petition debt, could violate the automatic stays of sections 362 and or 1301." *Singley*, 233 B.R. at 173. That statement is true; however, the language unfortunately conflates the intent to do the act violating the discharge injunction with the intended effect of the act.

proves nothing by proving an intent to violate the discharge injunction as such. Certainly it is relevant to know whether the defendant intended to do the *act* that *constitutes* a violation of the discharge, because, without that intent, an action for contempt would fail. *See id.* But it is unnecessary to demonstrate an intent to violate the discharge injunction as such.

It is also irrelevant. An example helps to explain why. A creditor, smarting from the write-off of his loan, privately sacrifices a goat to Mercury, the Roman god of merchants, believing devoutly that Mercury will see to it that the debtor repays the creditor in full. The creditor takes no actions to publicize his sacrifice. He has no reason to believe that the debtor believes in Mercury, or cares about goats. Certainly, the sacrifice is an intentional act, and it was subjectively intended to collect the debt. Indeed, it might be easy to show that the creditor, "with malice aforethought," had every intent to violate the dickens out of the bankruptcy discharge. But so what? All the intention in the world would not convert the creditor's sacrifice into "an act to collect, recover, or offset" the debt in question. Intentionally performing a useless and ineffective act cannot violate section 524(a) because a useless and ineffective act will not count as a proscribed act within the meaning of the statute – regardless of the avowed "intent to violate the discharge injunction."

The summary judgment evidence here is such that it is all but conceded that the defendant in this case intended to do the various acts of credit reporting in question. But that intent will only be relevant in this case if the underlying acts of credit reporting count as acts "to collect, recover or offset" debts owed to the defendant. If those underlying acts are more akin to sacrificing goats to Mercury, then they will no more trigger a violation of the plaintiff's discharge than would goat sacrifices, regardless of intent.

This in turn calls for an examination of what might make a given act one to collect, recover

or offset a debt owed the creditor. Needless to say, one cannot possibly imagine all the permutations or tactics that might be employed by an enterprising creditor to collect, recover or offset a debt, and writing up a set of "factors" only aids those intent on advising those who might want to find a way around the discharge. *See Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734 (5th Cir. 1999) (cautioning against a mechanical application of factors in the abstention context). Nonetheless, the courts are called upon to recognize which acts count as proscribed acts. What is it about a given course of conduct that might make it one to collect, recover or offset a debt?

At the very least, we might say that an act that is not, in any objective sense, effective as a means of collection, recovery or offset should not count as an act proscribed by the statute. Our goat sacrificing example above is a helpful, if fanciful, illustration of this principle. Most reasonable people will readily agree that goat sacrificing is not an act likely to be effective in collecting, recovering or offsetting the debt in question. But let's suppose that, before the fated sacrifice, the creditor first sends a photo of the unfortunate goat to the debtor with a note saying "Pay me or the goat is cabrito!" These additional facts are enlightening, but we still do not know whether they are sufficient to count as an act to collect, recover, or offset the debt, because we cannot yet gauge the likely impact of this threat on the debtor. If, however, the facts also showed that the debtor is also a devout believer in Mercury – or a deeply committed animal rights activist – then we might have enough facts to suggest that the note and the photo count as an act to collect on a debt – even without the actual sacrifice. This final fact shows the coercive impact of the missive, sufficient to fairly describe the act as likely to be effective to collect a debt. We can now say, on these facts, that sending such a missive to such a debtor could work as a collection device. On the other hand, if the evidence showed that the debtor believes that all Mercury worshipers are idiots, and couldn't care

-12-

less about killing goats, then the creditor's threatened sacrifice, and its publication of that threat to the debtor still lack coercive impact, and so would not likely count as an act to collect a debt.

There are case law examples of acts that are demonstrated to have such a coercive impact, such that they are held to count as a proscribed act under the statute. *See, e.g.*, *Parraway v. Andrews Univ. (In re Parraway)*, 50 B.R. 316, 319 (W.D. Mich. 1984) (holding that a defendant-university's policy of not releasing transcripts to students who owed debts to the university, regardless of the bankruptcy discharge, was a violation of the discharge). *Parraway* had clear evidence of a *quid pro quo* linking the university's act (We will not release transcripts . . .) with the collection effort (. . . until you pay us.), and reasonably concluded that the act would likely have the requisite coercive impact on a student or former student to render the act an effective collection device. *Id.* at 318.

Evidence of harassment might be another way of demonstrating that a given act is effective as an act to collect a debt. For example, there is the story of Mr. Stanley Stann, a man who simply would not take "no" for an answer. *See In re Andrus*, 189 B.R. 413 (N.D. Ill. 1995). Unhappy with his treatment in the Andruses' bankruptcy, Mr. Stann placed a large sign near the debtor's house stating "GENE ANDRUS, WHERE'S MY MONEY?" *Id.* at 414. Mr. Stann took that sign down in the shadow of contempt proceedings, but then promptly erected another: "GENE ANDRUS WENT BANKRUPT! HE DIDN'T PAY HIS BILLS. HE IS A DEADBEAT! THIS IS A PUBLIC SERVICE ANNOUNCEMENT." *Id.* at 415. In case the debtor did not get the message, Mr. Stann left the debtor a number of vulgar messages on his telephone answering machine, as well as more verbal messages delivered by shouting from the street. His missives included such gems as "No court is going to protect you. You get that deadbeat husband of yours. I want my money. I want Gene. I want my money." *Id.* Mr. Stann also offered to fight for it: "You're a deadbeat. I want my money.

Let's go. I'll beat it out of you." *Id.* The court in *Andrus* had little trouble concluding that this continuing harassment counted as an effective collection effort, because they were both calculated to inflict substantial pressure, and were likely to in fact succeed in exerting pressure. Most important, the court concluded that there was a substantial likelihood that, if the harassment continued for long enough, the debtor might actually pay the debt just to make it stop. *See also Gervin*, 337 B.R. at 855-56 (inflicting a certain level of emotional pain is a collection device designed to compel repayment of debt, because there is a likelihood that the debtor will pay in order to make the pain stop).

What these colorful examples show is that for any act to count as an act that violates the discharge, there must be evidence of an effective connection between the conduct of the creditor and the collection of the debt. The mere fact that the creditor committed an act is insufficient, as *Vogt* and *Irby* have shown. What is needed is some evidence that the act is one to effectively collect a discharged debt. Instead of evaluating whether the alleged contemner acted "with the intent to harass or coerce a debtor", *Singley*, 233 B.R. at 173, a court need only determine *whether the act itself* is likely to work. Common facts demonstrating that a given course of conduct is likely to be effective as a collection device include evidence of harassment or coercion. There may be other devices and tactics that constitute effective collection devices via some other means, though the court declines to speculate here on what those means might be. Regardless, the common theme is evidence that the tactic employed is one, viewed objectively, that is likely to be effective. If the tactic is effective, and the act was done intentionally, then a violation of the discharge can be made out. If the act cannot be shown to be effective, viewed objectively (such as, for example, by evidence of harassment or coercion), then there is no violation of the discharge, regardless of the subjective intent of the alleged contemner.

On this analysis, reporting of a debt to a credit reporting agency – without any evidence of harassment, coercion, or some other linkage to show that the act is one likely to be effective as a debt collection device – fails to qualify on its own as an "act" that violates section 524. The act of credit reporting *could* be part of a larger course of conduct that, taken together, might constitute an act likely to be effective to collect a debt, just as threatening to sacrifice a goat could be part of a larger tactic to collect a debt. In our goat sacrificing example, the key fact that converted goat sacrifice from delusional posturing to calculated collection was the debtor's belief in the god Mercury. Here, on this motion for summary judgment, the debtor fails to offer any competent summary judgment evidence that would raise a similar fact question to connect credit reporting to debt collection. We next turn to a review of that evidence in greater detail.

### Standard of Proof

The Court first considers one of Defendant's threshold arguments, which raises the question of the applicable standard of proof. "[I]n order to assess whether sufficient evidence is presented to require the case to go to trial for its resolution, the court must take into account the substantive evidentiary burden that will be applicable at trial." CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, 10A FEDERAL PRACTICE AND PROCEDURE § 2727 (3d. ed. West 1998).

Defendant claims that there is no private right of action for violation of section 524, citing *Pertuso v. Ford Motor Co.*, 233 F.3d 417, 422-23 (6th Cir. 2000)[5]. Instead, argues Defendant, a violation of the discharge injunction is to be pursued in a motion for civil contempt. In civil contempt proceedings, the movant must show a knowing violation of a court order by clear and

---

[5] Even if Defendant is correct that there is no private right of action for violation of the discharge injunction, this is no reason to dismiss the claim. *In re Beck*, 272 B.R. 112, 130 n.25 (Bankr. E.D. Pa. 2002) (finding that contempt may be brought in an adversary proceeding).

-15-

convincing evidence. *See In re Andrus*, 184 B.R. 311, 315 (Bankr. E.D. Ill. 1995). Defendant concludes that Plaintiff must prove his case by clear and convincing evidence, and not by a mere preponderance. Plaintiff's reply is silent on the question. The Court agrees with the Defendant's take on the question. "The burden of proof is on the former debtor to establish by clear and convincing evidence that creditor violated the post-discharge injunction." *In re Pincombe*, 256 B.R. 774, 782 (Bankr. N.D. Ill. 2000). In considering this summary judgment motion, the court must therefore take into account this heightened evidentiary burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."). With these preliminary considerations in hand, we turn to an examination of the summary judgment evidence, beginning with the plaintiff's motion to strike portions of the defendant's affidavits.

### Plaintiff's Motion to Strike Portions of Defendant's Affidavits

As part of his Reply, Plaintiff has moved to strike two portions of the affidavits submitted as part of Defendant's summary judgment evidence. Plaintiff points out that Defendant's affiants were not disclosed to Plaintiff as part of Defendant's Rule 26(a)(1) disclosures. Rule 26(a)(1) requires a party to provide to the other parties "the name . . . of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." FED. R. CIV. P. 26(a)(1).

The affidavits in question serve two purposes. First, they purportedly establish a predicate for the admissibility of the attached exhibits as business records of the Defendant. Second, they provide explanations regarding the contents of the attached documents. Regarding the affidavits' function of authenticating the exhibits as business records, the failure of the defendant to disclose

-16-

the identities of the affiants is harmless. That aspect of the affidavits will not be stricken. *See* FED. R. CIV. P. 37(c)(1). However, those portions of the affidavits providing explanation of the contents of the exhibits or the regular business practices of the Defendant are stricken for failure to comply with the mandatory disclosure rules. *See id.*; FED. R. CIV. P. 26(a)(1). Any other ruling would allow the defendant to profit from its failure to affirmatively comply with the rule-mandated duty to disclose. The explanations proffered are substantive, and render the affiants more than mere authenticators. This aspect of their affidavits is intended to serve as positive testimony over and above what the documents themselves disclose, and betrays the affiants as persons "likely to have discoverable information that the disclosing party may use to support its claims or defenses." *See* FED.R.CIV.P. 26(a)(1).

Plaintiff also objects to Exhibit A of the Belmontes affidavit as inadmissible because it was allegedly not prepared by the Defendant, but was prepared by a third party. The Plaintiff offers no evidence to support that contention, however, and the document on its face gives no indication about who prepared it. The sworn affidavit by Ms. Belmontes contradicts Plaintiff's unsupported allegations, and unsupported allegations afford no basis to disregard or second guess sworn testimony. Plaintiff's objection to the admissibility of Exhibit A as not being a business record is overruled.

### Problems with Plaintiff's "Affidavit"

Plaintiff has presented, as his main summary judgment evidence to challenge the summary judgment motion, an affidavit from Plaintiff himself. But Plaintiff's affidavit is facially not competent summary judgment evidence. Affidavits opposing summary judgment must be sworn. Fed. R. Civ. P. 56(e). The foot of the Plaintiff's affidavit contains the standard boilerplate

("SUBSCRIBED and SWORN to before me the undersigned authority . . . ."); however, the signature line is not properly authenticated as a legitimate notary signature. In addition, the name and commission date of the alleged notary are not disclosed.[6] The court's administrative rule regarding electronic filing requires electronically filed documents to contain either a scanned image of a signature or an "/s/" *with the name* typed in the location at which the signature would otherwise appear. Local Order 04-07 at 9. The administrative procedures order provides as an example of a notary's signature "/s/ Jane Doe, Notary Public." *Id.* The order further states, "If the '/s/' signature option is utilized for a notary public, the commission date for such notary public should be typed on the electronically-submitted document." *Id.* n.3. Because the affidavit as filed does not comply with the rules relating to the electronic filing of sworn affidavits, it is not "sworn or certified" as the federal rules stipulate in order for an affidavit to count as competent summary judgment evidence. *See* FED. R. CIV. P. 56(e); *cf. Clendennen v. Williams*, 896 S.W.2d 257 (Tex. App.–Texarkana 1995, no writ) (holding under Texas law that a document purporting to be an affidavit, without a notary's signature or seal, is not competent summary judgment proof).

This is not a "ticky-tack" rule. It is elementary that if a signature upon a legal document is to have legal effect, it must be plain from the document just whose signature appears; after all, a signature is "a person's name or mark written by that person or at that person's direction." BLACK'S LAW DICTIONARY 1415 (8th ed. 2004). No name; no signature. The notary in this case did not *sign* the electronic document. We don't even know who the notary is, or whether the notary still has an active commission. Without the notary's signature, the jurat is ineffective, and without an

---

[6] The jurat says only "/S/" above "Notary Public State of Texas." The name and commission date of the notary are not shown anywhere on the document.

effective jurat, the affidavit is deemed to be unsworn. *See Blanco, Inc. v. Porras* 897 F.2d 788, 792 (5th Cir. 1990) ("An affidavit is statutorily defined in Texas as 'a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by such officer under his seal of office.' TEX. GOV'T CODE ANN. § 312.011(1)"); *see also Steinle v. Warren*, 765 F.2d 95, 100 (7th Cir. 1985) (purported affidavit offered to rebut summary judgment found to be ineffective because "[i]t does not purport to show where it was executed. The jurat is wholly defective. The identity of the notary is incomplete, failing to disclose where she was commissioned and when her commission expires").

Doubtless, Plaintiff could re-file this affidavit, this timely properly authenticated. What is more, the Defendant did not raise this defect. Thus, in the interest of finality (and of a complete record), the Court will proceed as though the Plaintiff had already remedied this technical defect. The Plaintiff's summary judgment evidence still falls short, for the reasons set out below.

**There is no competent summary judgment evidence of an act to collect**

The Plaintiff has failed to place in the record any competent summary judgment evidence that would even raise a material issue of fact as to whether the Defendant engaged in an act to collect, recover or offset a discharged debt. Plaintiff has introduced evidence leading to an inference that the Defendant engaged in post-discharge credit reporting activity – itself not forbidden –  but there is no evidence whatsoever that would raise an issue of fact as to a link between the reporting activity and the collection of the debts in question.

We begin with the contents of Plaintiff's affidavit, chock full of conclusory statements, unsubstantiated allegations, and incorrect interpretations of bankruptcy law, but devoid of competent summary judgment evidence linking Defendant's credit reporting activity with an attempt to collect.

-19-

Rule 56(e) states, "Supporting and opposing affidavits shall be made on personal knowledge, . . . and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). As will be seen, the affidavit supplied by defendant in opposition to the motion fails this test.

The second paragraph of the affidavit states:

> I had my attorney contact Providian (Washington Mutual) to reaffirm my pre-petition debt. Providian did not allow me to reaffirm, so I did not reaffirm the debt. Attached hereto are true and correct copies of the letter I had my lawyer fax to Providian, asking to reaffirm the debt and true copies of Providian records regarding the same, including notice of the bankruptcy and receipt of correspondence from my lawyer which was furnished by Washington Mutual in response to my discovery requests.

Affidavit at 1-2. This evidence is indeed relevant to the question of the Defendant's intent regarding the purpose of its credit reporting, but not because it favors the Plaintiff. To the contrary, this evidence tends to demonstrate that the Defendant had *no* desire to continue to hold the Plaintiff personally liable on Plaintiff's pre-petition debt. If a creditor wanted to hold a debtor personally liable on his debt notwithstanding the bankruptcy discharge, a reaffirmation agreement is a common and inexpensive way to do so. *See* 11 U.S.C. § 524(c). This paragraph is helpful to the *Defendant*, not to the Plaintiff. It offers no relevant evidence on the essential question before the court – did the Defendant intend to do an act *that counted as an act to collect, recover or offset* a debt owed the creditor.

The paragraph continues:

> Also attached hereto are true and correct copies of excerpts from my credit reports which show that Washington Mutual reported my pre-petition debt to it as a "charge off" during 2004, 2005 and 2006. These are the same documents which are attached to Washington Mutual's motion for summary judgment. This reporting by Washington Mutual on my credit report is a false representation and attempt to collect a debt. The bank should have reported 0 balance included in bankruptcy.

-20-

> Instead the bank reported a delinquent debt, which it charged off as uncollectable
> with a 0 balance (due to the charge off).

Affidavit at 2. Here, Plaintiff relies upon the scanned faxes of credit reports apparently retrieved over the internet from "www.truecredit.com". The three pages of reports attached to Plaintiff's Response appear to be reproductions of documents submitted by the Defendant as part of its summary judgment proof. Apparently, Plaintiff wishes for the court to draw the inference that, because these three pages – out of hundreds of other pages of purported credit reports – allegedly *contain* incorrect information, the Creditor, in turn, must have falsely *reported* credit information, and therefore, this was an act to collect the debt.

This dog won't hunt. First, the credit reports – from both Plaintiff and Defendant – are of dubious evidentiary value, because they are unaccompanied by any extrinsic evidence of authenticity (such as an affidavit describing how the exhibits were put together). These credit reports appear to come from a variety of intermediaries (Credit Expert, TrueCredit, "Free Online Credit Reports", and more). The reports, apparently, all derive their information from the three different credit reporting bureaus (Equifax, Experian and TransUnion). We say apparently, because Plaintiff has provided no evidence of how these intermediaries get their information from the bureaus, how they process this information for presentation over the internet, or the delays involved (if any) in the process. Plaintiff has submitted no direct evidence of what the Defendants may have reported to anyone, to whom they reported anything, or when they may have done so. In short, Plaintiff is attempting to prove a statement by the Defendants by showing a cherry-picked three pages (out of hundreds) of credit reports, which are not statements of the Defendants, not statements of one who directly received Defendant's statements, but rather statements of parties twice removed. And, all of this without

evidence of how, when, and by whom, this information was transmitted and processed. But suppose for the sake of discussion, we presume authentication. The proffered evidence still does not advance the Plaintiff's case, because the evidence, accepted as true, still does not establish a link between credit reporting and debt collection.

Plaintiff's statement that Defendant's reporting is an attempt to collect a debt ("This reporting by Washington Mutual on my credit report is a false representation and attempt to collect a debt.") is conclusory. No facts are offered to support it.

Plaintiff's allegation of false reporting is not backed by any evidence. First, Plaintiff is basing his argument for falsity not upon Plaintiff's own statements, but upon alleged falsity in the statements made by entities twice-removed from the defendant. Second, even if it could be shown that the intermediaries reported the credit information perfectly, the Court cannot say that any of it is false. Plaintiff makes unsubstantiated allegations concerning what the "Metro" credit reporting standards would require in a report, but offers no evidence of the "Metro" credit reporting standards. It is impossible to say what import might be drawn from how the information was reported unless the Court at least had the evidence with which to determine the meanings assigned to certain terms as used in the credit reporting industry. Plaintiff makes similar unsupported allegations regarding the term "charge off" in the credit reports. Without evidence of what the term "charge off" means in the context of a credit report, there is simply no evidence that "charge off" has anything to do with collection of a debt. There is certainly nothing on the face of the documents that could lead a fact-finder to say that the documents are incorrect.

Further, even if the credit reporting were proven to be false, the only evidence linking Defendant's credit reporting activity with an attempt to collect a debt is Plaintiff's own statement

in his affidavit. There is no objective testimony, expert or otherwise, concerning the use of credit reporting – true or false – to extract post-discharge payments. There is no document showing how Defendant allegedly collects discharged debts via manipulation of credit information. The record contains no representations by Defendant that if Plaintiff paid his debt, Defendant would modify the credit information, or that such a *quid pro quo* was offered. Plaintiff admits that he has never, since his bankruptcy filing, received any collection calls or letters from the Defendant or third-parties attempting to collect the Plaintiff's pre-petition debt to Defendant. Motion, Exhibit B.

The "affidavit" continues, "This means I still [sic] the debt, according to Washington Mutual's reporting. The terms 'Charge off as bad debt' and 'discharged in bankruptcy' are mutually exclusive. The first means I still owe a debt. The second means I do not." Plaintiff offers *no* support for his statements regarding the meaning of the credit reports, his interpretation of Washington Mutual's reporting system, or the meanings of what appear to be terms-of-art in credit reporting. The record contains no information certifying the affiant as an expert in credit reporting, a custodian of Washington Mutual's records, or a person otherwise having experience to properly interpret credit reports.[7]

Plaintiff also asserts in his affidavit that a debt that is discharged in bankruptcy is no longer owed. This is a legal conclusion, not testimony. As has already been discussed, it is also flat wrong.

In conclusion, Plaintiff's affidavit does not demonstrate any falsity in the reports, and even if it did, it is not competent evidence of any attempt to collect a discharged debt. The remaining exhibits attached to Plaintiff's affidavit also fail as evidence that would raise a fact issue as to

---

[7] Perhaps debtor's *counsel* "knows" what these terms mean and how they are used in the industry, and perhaps debtor's counsel is seeking to testify through his client's affidavit (which counsel no doubt drafted). But counsel for a party is not competent to testify as a fact witness, nor would he be competent to serve as an expert witness on this issue.

whether the Defendant's act of credit reporting is also, objectively, an effective act to collect a debt. Plaintiff seems to implicitly know that he has no evidence of such an act, because in his response, he complains about being stonewalled in discovery. That may have happened, but it is too late to complain about it after discovery has closed and summary judgment motions have been filed. There has been sufficient time for discovery, and if Plaintiff believed that he was not receiving the cooperation to which he was entitled under the discovery rules, he had ample opportunity to take action at the appropriate stage of this lawsuit.

### Conclusion

For the reasons given above, the court GRANTS judgment in favor of Defendant on Plaintiff's claim for violation of the discharge injunction. The Court DISMISSES, for lack of subject-matter jurisdiction, Plaintiff's claim for unreasonable collection efforts. A separate form of judgment shall be entered, consistent with this decision.

# # #